STATE OF MAINE
CUMBERLAND, ss

STATE OF MAINE
Cumberland, ss, Clerk's Office

JAN 0 7 2016

RECEIVED

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-14-59

DANA TRATTNER,

Petitioner

v.

ORDER ON PETITIONER'S
RULE 80C APPEAL

MAINE PUBLIC EMPLOYEES
RETIREMENT SYSTEM,

Respondent

Before the court is petitioner Dana Trattner's Rule 80C appeal challenging respondent Maine Public Employees Retirement System's denial of her application for disability retirement benefits and the subsequent denial of her appeal to the Board of Trustees (Board). For the following reasons, the court reverses respondent's denial of petitioner's application.

## I. FACTS

Petitioner has worked as an educator in Maine for approximately 17 years. Around 1993, she began working as an adult education teacher and life skills coach at Creative Work Systems. (Rule 80C record at 21.3) (hereinafter "R. __.") From 2002 to 2004, she worked as an Ed Tech in the Scarborough School Department, and in 2004, she began working as a Library Ed Tech III at Wentworth Intermediate School. (R. 21.3.) As a Library Ed Tech III, her job duties included checking books in and out, notifying students and teachers regarding reserved books, teaching students research skills, repairing, shelving, and ordering books, monitoring students' behavior, and maintaining and operating library computers. (R. 21.3.)

In 2009, the staff was reduced from three Library Ed Techs to two. (R. 21.3.) The job duties of the Library Ed Tech who was eliminated were split between the remaining Library Ed

1

Techs, one of whom was petitioner. (R. 10.13.) As a result, petitioner's workload increased and she allegedly was not provided with support to meet this additional demand. (R. 10.13-10.14.)

Petitioner has had issues with her hearing and vision for a number of years. (R. 21.3.) She had corneal transplants in 1982 and 1983. (R. 21.3.) Sometime after 2000, she was diagnosed with moderate to severe bilateral sensorineural hearing loss and began using hearing aids. (R. 21.3.) In 2007 or 2008, she was diagnosed with age-related macular degeneration. (R. 21.3.) Petitioner has been treated by audiologists Abagail Forcier and Marty Layne, as well as ophthalmologists Frederick Miller and Scott Steidl. (R. 21.5-21.6, 3.446.)

Petitioner asserts that, as a result of these issues, she cannot operate video equipment or digital cameras, shelve books, read books to students, or hear safety announcements related to lockdown and fire drills, among other duties. (R. 10.122-10.133.) In the spring of 2012, petitioner informed the Scarborough School Department of these issues and requested accommodations. (R. 21.4.) The school department provided her with a bell tone to help her get the students' attention, a magnifying glass to read bar codes on books, a keyboard with black-on-yellow large print keycaps, and "zoom technology" for her computer. (R. 21.4, 3.470.)

In January 2012, the school principal, Anne-Mayre Dexter, met with petitioner to discuss several work performance issues. (R. 21.4.) These issues included chronic tardiness, problems with organization, and difficulty following lesson plans completely. (R. 21.3, 3.12-3.13.) Petitioner's tardiness improved after she began commuting with a coworker, but the other issues continued. (R. 21.4.) Ms. Dexter and petitioner met again in March 2012 to devise an "action plan" to address the remaining issues. (R. 3.13.) They continued to meet regularly, but Ms. Dexter did not see improvement in petitioner's job performance. (R. 3.13.) Petitioner asserts that

2

her performance issues were related to her vision and hearing losses, however Ms. Dexter asserts the action plan was not related to these issues. (R. 3.14, 10.147-10.149.)

On October 9, 2012, petitioner applied to respondent for disability retirement benefits on the basis of an anxiety disorder, age-related macular degeneration, corneal transplants, hearing loss, and scarring on the pons of the brain. (R. 3.7-3.9.) She resigned on October 11, 2012. (R. 21.4.) On February 7, 2013, a board of physicians acting as an advisor to respondent (Medical Board) issued four memoranda stating that the evidence petitioner submitted did not establish: (1) the existence of the anxiety disorder or (2) "functional limitations" associated with her macular degeneration, corneal transplants, hearing loss, and scarring on the pons of the brain. (R. 3.485-92.) On February 12, 2013, respondent denied her application, finding, as had the Medical Board, that the evidence petitioner submitted did not establish: (1) the existence of the anxiety disorder or (2) "functional limitations" associated with the other conditions. (R. 1.1.)

On February 19, 2013, petitioner appealed to the Board. (R. 2.1.) A hearing before a Hearing Officer occurred on July 10, 2013. (R. 10.2.) On February 4, 2014, the Hearing Officer issued her final recommended decision affirming respondent's denial. (R. 21.1-21.7.) On August 12, 2014, the Board adopted the Hearing Officer's recommended decision. (R. 27.2.) Petitioner appealed to this court on December 12, 2014. A hearing on petitioner's appeal was held on November 30, 2015.

## II. DISCUSSION

### A. Standard of Review

To qualify for disability retirement benefits, an applicant bears the burden of proof to demonstrate by a preponderance of the evidence that "the applicant has a mental or physical incapacity that: (1) is expected to be permanent, and (2) makes it impossible to perform the

3

duties of the applicant's employment position." *Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 4, 985 A.2d 501; 5 M.R.S. § 17921(1)(A)-(B) (2014); *Douglas v. Bd. of Trs.*, 669 A.2d 177, 179 (Me. 1996). "When an agency concludes that the party with the burden of proof failed to meet that burden, [the court] will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference." *Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676 (citation omitted). The reviewing court may not "substitute its judgment for that of the agency on questions of fact" and may only affirm the decision, remand for further proceedings, or reverse or modify on the basis of constitutional or statutory violations, unlawful procedure, bias, errors of law, findings unsupported by substantial evidence, or arbitrary and capricious decisions. 5 M.R.S. § 11007(3)-(4) (2014).

B. Rule 80C Appeal

Petitioner argues: (1) the Medical Board committed an error of law when it considered an interview of the school principal, Ms. Dexter, because that document is not a medical record and (2) the Board's decision is unsupported by substantial evidence because it failed to consider the combined effects of petitioner's hearing and vision losses and ignored persuasive evidence from Drs. Steidl and Layne.

1. Error of Law

The Board did not commit an error of law when it considered Ms. Dexter's interview, even though the interview is not a medical record. The Medical Board must "[p]rovide a written report of its analysis of how the applicant's medical records do or do not demonstrate the existence of physical or mental functional limitations entitling an applicant to benefits . . . ." 5 M.R.S. § 17106(3)(D) (2014). In making this written report, however, that statute directs the Medical Board to review "the file," which encompasses more than the applicant's medical

4

records. 5 M.R.S. § 17106(3) (2014); *see Kelley*, 2009 ME 27, ¶ 11, 967 A.2d 676 (medical board issued memorandum based in part on transcript of doctor's testimony before hearing officer). In other words, the statute directs the Medical Board to analyze the applicant's medical records in its report but does not restrict the materials the Medical Board considers in making this analysis, as long as those materials are included in the file. Without the ability to evaluate and compare an applicant's medical condition with her job description and performance, it is difficult to see how the Medical Board could accurately assess an applicant's ability to perform her job. As a result, the Board did not commit an error of law when it considered the interview.

2. Substantial Evidence

Petitioner concedes that she has not met her statutory burden regarding the anxiety disorder and scarring on the pons of the brain. (Br. of Pet. 2.) The remaining issue is whether substantial evidence exists to support the Board's conclusion that petitioner failed to establish by a preponderance of the evidence that her vision and hearing losses was permanent and that these losses made it impossible for her to perform her job duties.

a. Combined Effects

The court finds that the Board did consider the combined effects of petitioner's hearing and vision loss. In *Hale-Rice v. Me. State Ret. Sys.*, the Law Court recognized that an individual may be disabled due to "incapacities resulting from the combined effects of physical and emotional problems, given the reality that the interrelationship of such problems often results in a permanent inability to work." 1997 ME 64, ¶ 10, 691 A.2d 1232. In that case, the court found that the Board had considered combined effects when it noted the effect of the petitioner's injury on her self-esteem and depression. *Id.* ¶ 11. Similarly, the Hearing Officer in this case considered the combined effects when she stated "While the combination of vision problems and hearing

5

problems clearly made her job difficult, impossibility is not the same as difficulty, it is a much higher standard." (R. 21.6.) However, as discussed below, the Board's conclusion that petitioner failed to meet her burden is not supported by substantial evidence.

b. Vision and Hearing Losses

Petitioner's medical records show that she suffers from significant vision loss. Dr. Miller asserts that petitioner's macular degeneration and bilateral corneal transplants are "slowly progressive and cause greater blurring of sight needed for librarian occupation." (R. 3.299.) Following an appointment in January 2012, Dr. Steidl concluded that petitioner suffers from legal blindness. (R. 6.6.) He further concluded that, as of October 2012, petitioner did not have central visual function. (R. 6.7.) Dr. Steidl explains that:

> The problem with loss of central vision is that a person cannot read a line of print or a series of words because the center portion would always be missing; this makes it extremely difficult to do any reading with any speed and requires people to pick apart pieces of words and put them together in their mind, which is a very slow process.

(R. 6.7.) His opinion as to the permanency of her condition and the impact of her condition on her job duties is as follows:

> In my medical opinion, her visual acuity is likely to continue to deteriorate and will be highly unlikely to improve at any point due to the chronic degenerative nature of the macular degeneration and her compounding myopic degeneration . . . Of the twenty-two described performance responsibilities . . . seventeen of these seem relevant and detailed enough for comment. Of those, more than half, at least ten, would be nearly impossible for her to accomplish without extensive accommodations for someone visually impaired, and even then might prove to be difficult to impossible to accomplish.

(R. 6.10.) Although not medical evidence, the court also notes that petitioner's coworker observed that it was "very, very difficult" for petitioner to see the computer screen, that it was impossible for petitioner to read printed lesson plans, and that petitioner was unable to see the

6

spine labels on books, and therefore unable to shelve books. (R. 10.18-10.19, 10.23.) At the hearing, petitioner described her perception of the Hearing Officer and attorneys as follows:

> I see your—I see your hair, I see that ear and I can kind of tell that you have glasses and I can see a little bit of a nose there but otherwise I cannot see whether you are looking at me or looking across the room or looking behind me . . . I only see one eye and if I'm looking at the eye I don't really see the nose. If I look to see both eyes, I'd have to look up at your skull or over to your ear . . . [I have] a hole in my vision.

(R. 10.108-10.109.)

Petitioner's medical records also show that she suffers from significant hearing loss. Dr. Layne's opinion is that petitioner "will be affected in over 90% of her communication situations." (R. 3.193.) Dr. Layne explains the testing she performed on petitioner as follows:

> I repeated the controlled test in the sound room at a level of 40dB, attempting to recreate what she might encounter in a work situation with children's voices. In this instance, her comprehension dropped to 28%, or the ability to recognize one in three words. A normal hearing adult will understand 90-100% of words in this instance. We can also assume that if there is background noise, such as announcements or competing conversation, these comprehension scores will drop even more drastically.

(R. 6.16.) With regard to permanency, Dr. Layne's opinion is that "The auditory system, once damaged, cannot return to normal." (R. 6.16.) Although not medical evidence, the court also notes that petitioner's coworker observed petitioner fail to respond to a lockdown drill announcement over the loudspeaker. (R. 10.21-10.22.) As a result, petitioner continued her lesson and did not lock the doors, pull down the shades, or take the children to a secure area, as was the procedure. (R. 10.22.)

This evidence compels the conclusion that petitioner is permanently unable to perform her duties, especially after those duties were increased. It is difficult to see how petitioner could perform her duties with a hole in her vision and the ability to hear approximately one in three words. Petitioner's visual acuity is "highly unlikely to improve at any point" and her hearing

7

cannot be restored to normal. Indeed, the assistant superintendent of schools believed that "In the end, [petitioner] was not able to do the job." (R. 7.3.) On this record, substantial evidence does not exist to support the Board's conclusion that petitioner failed to establish by a preponderance of the evidence that her vision and hearing losses were permanent and that these losses made it impossible for her to perform her job duties.

## III.    CONCLUSION

The court hereby ORDERS that petitioner's Rule 80C appeal is GRANTED and the Board's decision is REVERSED.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated: _June 7, 2016_

Roland Cole
Chief Justice, Superior Court

8